UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Bilal Haidari, | File No. 22-cv-2939 (ECT/ECW) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Alejandro Mayorkas, *Secretary of the U.S. Department of Homeland Security (DHS)*; Chris Magnus, *Commissioner of U.S. Customs and Border Protection (CBP)*; and Christopher Wray, *Director, Federal Bureau of Investigation (FBI)*, | |
| Defendants. | |

Mohamed Juldeh Jalloh, Jalloh Law Office, Brooklyn Park, MN, for Plaintiff Bilal Haidari.

Alexander N. Ely, United States Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, and Ana H. Voss, United States Attorney's Office, Minneapolis, MN, for Defendants Alejandro Mayorkas, *Secretary of the U.S. Department of Homeland Security (DHS)*, Chris Magnus, *Commissioner of U.S. Customs and Border Protection (CBP)*, and Christopher Wray, *Director, Federal Bureau of Investigation (FBI).*

Plaintiff Bilal Haidari alleges that federal agents subject him to enhanced screening at airports and other locations because he is a Muslim. He claims that these enhanced screenings violated the First Amendment's Establishment and Free Exercise clauses and the Religious Freedom Act (or "RFRA"), amounted to retaliation in violation of the First Amendment's free-speech guarantees, and violated the Fifth Amendment's equal-protection guarantee.

Defendants seek dismissal of Mr. Haidari's Complaint under Federal Rule of Civil Procedure 12(b)(6), and the motion will be granted. Mr. Haidari does not allege facts plausibly showing essential elements of his claims, including that any of the screenings Mr. Haidari complains of were undertaken because of his Muslim faith. Mr. Haidari's Complaint will be dismissed without prejudice, and Mr. Haidari will be given an opportunity to file an amended complaint.

I[1]

Mr. Haidari is naturalized United States citizen. Compl. ¶ 8. He resides in Minnesota. *Id.* ¶ 4. He "is founder and General Manager at AGA Worldwide." *Id.* ¶ 11. "AGA Worldwide is a logistics company headquartered in Minnesota that specializes in the delivery of vehicles from auction house to port both domestically and internationally." *Id.* ¶ 12. Mr. Haidari's work requires him to travel frequently both domestically and internationally. *Id.* ¶ 13–14. As noted, and of central relevance to his claims in this case, Mr. Haidari is Muslim. *Id.* ¶ 4.

Federal agents have "detained" Mr. Haidari many times when he has traveled "internationally and domestically by air." *Id.* ¶ 14. These detentions have lasted "several hours" and have included "intrusive searches and phone seizures." *Id.* ¶ 15. The Complaint

---

[1] In accordance with the standards governing a Rule 12(b)(6) motion to dismiss, the facts are drawn entirely from the Complaint and documents embraced by it. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Here, the Complaint references several exhibits. *See, e.g.*, Compl. [ECF No. 2] at 2–3. These exhibits are not attached to the Complaint but are filed under a separate docket number, ECF No. 3. The exhibits are 229 pages in length. *Id*. No party questions their authenticity, making it appropriate—at least as a general rule—to consider these documents in adjudicating Defendants' motion to dismiss. *Zean*, 858 F.3d at 526.

includes allegations describing eight such incidents occurring between December 26, 2019, and June 5, 2021. *See id.* ¶¶ 23–36. In the December 26, 2019, incident, for example, Mr. Haidari alleges that he "was returning to the U.S. with his elderly permanent resident mother from Beirut, Lebanon to Minneapolis[.]" *Id.* ¶ 23. "[T]heir flight was stopped in Paris, France and they were both subjected to a lengthy delay and secondary inspection." *Id.* ¶ 24. The inspections described in the Complaint lasted from between forty minutes, *id.* ¶ 33, to several hours, *id.* ¶ 30. "These searches are not routine searches, but a double-search with an explosives specialist standing on guard." *Id.* ¶ 28.

These detentions have resulted in adverse consequences for Mr. Haidari. For example, he "has missed multiple flights" as a result of being delayed by inspections. *Id.* ¶ 20. He has been forced to drive instead of paying additional sums to re-book on later flights. *Id.* ¶ 30. He has missed work-related calls because agents seized his cellular telephone. *Id.* ¶ 32. He "has been forced to arrive far in advance of his flights just to compensate for the inevitable delay caused by the government." *Id.* ¶ 21. And he and family members who have traveled with him have experienced humiliation and anxiety. *Id.* ¶¶ 22, 24, 26.

Mr. Haidari alleges that these detentions have occurred because he "has unfairly and repeatedly been subjected to Secondary Security Screening Selection (SSSS) during his travels." *Id.* at 2; *see also id.* ¶ 18. The Complaint does not define or describe "Secondary Security Screening Selection." Publicly available authorities indicate that the Transportation Security Administration instructs commercial air carriers to put the designation "SSSS" on a passenger's boarding pass to indicate that the individual must

undergo enhanced screening. *See, e.g.*, *Kovac v. Wray*, --- F. Supp. 3d ---, No. 3:18-cv-0110-X, 2023 WL 2430147, at *2 n.16 (N.D. Tex. Mar. 9, 2023). This description is consistent with the allegations in Mr. Haidari's Complaint. As a result of the SSSS designation, "Mr. Haidari is unable to print his boarding pass through the internet or a self-service kiosk at the airport." Compl. ¶ 16. He "instead must go to the airport service counter where he must then wait for the airline agent to receive clearance from a higher authority." *Id.* ¶ 17. Enhanced screening follows. *Id.*

Mr. Haidari has raised concerns regarding his SSSS designations and enhanced screenings with the Department of Homeland Security (the "Department" or "DHS"). *See id.* at 2–3; ¶¶ 39–42.[2] For example, the Complaint's exhibits include a copy of a complaint form that Mr. Haidari completed on January 31, 2020, in which he explained his belief that he was on a "watchlist" and requested resolution of his situation. ECF No. 3 at 71–75. The Complaint's exhibits also include copies of three separate letters addressed to Mr. Haidari from the Department responding to "Traveler Inquiry Forms" Mr. Haidari evidently submitted. *Id.* at 61–62 (letter dated October 18, 2021); 65–66 (letter dated June 4, 2020); and 182–83 (letter dated September 30, 2019). The Department's letters indicate that Mr. Haidari submitted each of his inquiries through the "Traveler Redress Inquiry

---

[2]     The Complaint's exhibits include an August 1, 2019, letter from the Transportation Safety Administration (or "TSA") informing Mr. Haidari of TSA's determination that he was not eligible to participate in the TSA PreCheck Application Program. ECF No. 3 at 219. In this letter, TSA explained: "Based on a comprehensive background check, TSA was unable to determine that you pose a sufficiently low risk to transportation and national security to be issued a known traveler number and granted eligibility for expedited airport security screening." *Id.* Mr. Haidari does not refer to this letter in the Complaint, and he does not appear to challenge this determination in this case.

Program" (or "TRIP").  *See id.* at 61, 65, and 182.  Each of the Department's three letters

includes an identical paragraph describing the Department's response to Mr. Haidari's

inquiries:

> DHS has researched and completed our review of your case.
> DHS TRIP can neither confirm nor deny any information about
> you which may be within federal watchlists or reveal any law
> enforcement sensitive information.  However, we have made
> any corrections to records that our inquiries determined were
> necessary, including, as appropriate, notations that may assist
> in avoiding incidents of misidentification.

*Id.*   The letters also provided Mr. Haidari with a "redress control number" and

recommended that Mr. Haidari provide the number when making travel reservations to

"help prevent misidentification from occurring during security checks against government

records and other information."  *Id.*  Mr. Haidari alleges that he used the redress control

numbers provided to him but that his use of the numbers appeared to have no effect on

preventing him from being assigned an SSSS designation and undergoing enhanced

screening as a result.  Compl. ¶ 41.[3]

Mr. Haidari has never received an explanation from the Department of Homeland

Security as to why he has been selected for enhanced screening.  *See id.* at 2 ("Border and

TSA agents have continued to carry out these SSSS detainments without explanation

despite never providing a shred of justification as to why Mr. Haidari is subjected to such

---

[3]      Each of the three DHS letters contains the following statement: "This letter
constitutes our final agency decision.  Pursuant to 49 USC 46110, you have 60 days to seek
review of this decision in an appropriate United States Court of Appeals."  ECF No. 3 at
62, 66, 183.  Mr. Haidari does not allege that he sought review under the referenced statute.
Regardless, Defendants do not argue that Mr. Haidari's failure to seek review under §
46110 justifies dismissal of, or undermines Mr. Haidari's ability to seek relief in, this case.

discriminatory treatment."); ¶ 19 ("If there is a selection process, it selects Mr. Haidari every single time for no discernable reason."); ¶ 38 ("Mr. Haidari has never been given any explanation for why he is always given SSSS classification when travelling."); ¶ 43 ("Mr. Haidari has repeatedly offered to meet with DHS officials to discuss why the government unfailingly singles him out for SSSS classification, but he has been ignored.").

Mr. Haidari has sued three Defendants in this case. Defendant Alejandro Mayorkas is Secretary of the Department of Homeland Security. *Id.* ¶ 5. Mr. Haidari alleges that DHS is "ultimately responsible for the challenged conduct." *Id*. Defendant Chris Magnus is Director of U.S. Customs and Border Protection ("CBP"). *Id*. ¶ 6. Mr. Haidari alleges that "CBP is the agency whose actions comprise the conduct that have [sic] violated [] Haidari's constitutional rights." *Id*. Defendant Christopher Wray is Director of the Federal Bureau of Investigation ("FBI"). Mr. Haidari alleges that "[t]he FBI is the agency which would be responsible for placing and keeping Mr. Haidari on any terrorist watch list or other form of heightened suspicion . . . which would trigger during his into, out of and within the United States." *Id*. ¶ 7. Mr. Haidari does not seek damages. *See id.* at 16–17. He seeks a declaration that these violations have occurred, injunctive relief aimed at preventing further enhanced screening, expungement of records of any past screening, and attorney's fees. *Id.*

## II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787,

792 (8th Cir. 2014) (citation omitted).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A

To support his claims under the Establishment and Free Exercise clauses, and perhaps to support his Fifth Amendment due process claim, Mr. Haidari alleges that Defendants have a "*policy and/or practice* of singling out and targeting" Muslims for SSSS designation and enhanced screening.  Compl. ¶¶ 50, 56, 74 (emphasis added).  The Complaint's allegations do not plausibly show the presence of such a policy or practice. This is so for two reasons.

*First*, as a general rule, a plaintiff does not plausibly show that a governmental policy exists by alleging only that he suffered assertedly unlawful conduct.  *See Allen v. New York City Dep't of Env't Prot.*, 51 F. Supp. 3d 504, 518–19 (S.D.N.Y. 2014) (collecting cases).  Here, the Complaint's factual allegations concern only Mr. Haidari's experiences.  But nothing about Mr. Haidari's experiences as the Complaint describes them plausibly suggests that they resulted from a policy of targeting individuals because of their Muslim faith.  If Mr. Haidari's allegations were enough to show a policy, it is difficult to understand how every plaintiff who plausibly claims to be the victim of unlawful

discrimination by the government (or any organizational defendant) would not also plausibly allege the existence of a policy favoring that discrimination.[4]

*Second*, this issue aside, the Complaint alleges no facts tending to show that Mr. Haidari received the SSSS designations and enhanced screenings because he is Muslim. Mr. Haidari alleges the unfortunate circumstances of his treatment. And he alleges he is Muslim. But there are no allegations connecting the two. The Complaint does not allege, for example, what happened during the enhanced screenings that might suggest they occurred because of Mr. Haidari's Muslim faith, the frequency with which Muslim individuals are assigned SSSS designations, or the frequency with which Muslims experience enhanced screenings vis-à-vis other religious groups. Neither the Complaint nor its exhibits anywhere attribute Mr. Haidari's concern that his name may have appeared on a watchlist to discriminatory animus. *See* ECF No. 3 at 71–75. Without allegations plausibly showing that his Muslim faith caused his adverse treatment, Mr. Haidari cannot plausibly show either discrimination on this basis or the existence of a policy of discrimination on this basis. To frame the conclusion in the pleading standard's terms, the Complaint's allegations in this respect are insufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555.

---

[4]     Defendants describe written DHS and CBP policies prohibiting discrimination based on religion. Defs.' Mem. in Supp. [ECF No. 17] at 11 (citing https://perma.cc/6ZN4-TAKB (last visited July 26, 2023)) (DHS policy); *id*. at 7 (citing U.S. Customs and Border Protection Standards of Conduct § 7.11.1, https://perma.cc/83ZD-LE5P (last visited July 26, 2023)) (CBP policy). Mr. Haidari does not dispute that these policies are in effect and appropriate for consideration at this motion-to-dismiss stage, and he accepts that these are "religiously and ethnically neutral policies, which, if acted upon, would not violate the Plaintiff's constitutional protections." Pl.'s Mem. in Opp'n [ECF No. 23] at 8.

B

The First Amendment's Establishment Clause prohibits Congress from making any law "respecting an establishment of religion." U.S. Const. amend. I. Establishment Clause claims are analyzed by asking two questions. *New Doe Child #1 v. United States*, 901 F.3d 1015, 1021 (8th Cir. 2018). "First, what do historical practices indicate about the constitutionality" of the challenged governmental action? *Id.*; *see Town of Greece v. Galloway*, 572 U.S. 565, 576–77 (2014)); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. ---, 142 S. Ct. 2407, 2428 (2022). "Where 'history shows that the specific practice is permitted,' [the court] need go no further; the Establishment Clause claim fails." *New Doe Child #1*, 901 F.3d at 1021 (quoting *Galloway*, 572 U.S. at 577). "But where history has not spoken to the 'specific practice' at hand, *Galloway* indicates that we look to the historical understandings of the Establishment Clause as informed by other relevant practices." *Id*. The second question is whether the challenged practice is "impermissibly coercive." *Id.*

Mr. Haidari's Establishment Clause claim seems somewhat atypical. He alleges that Defendants violated the Establishment Clause by their "policy and/or practice of singling out and targeting [] Haidari because he is a Muslim," and that Defendants' conduct, which is "not narrowly tailored to achieve any compelling government interest," puts "religiously coercive pressure on Muslims . . . to hide or alter [their] religious faith." Compl. ¶ 47–53. The claim, in other words, is that by disfavoring Mr. Haidari and Muslims generally, Defendants effectively endorse other religious beliefs. Mr. Haidari does not identify the endorsed beliefs.

9

Mr. Haidari's Establishment Clause theory seems a better fit for the Free Exercise Clause. It is true that the Supreme Court has "often [in its Establishment Clause cases] stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). "These cases, however, for the most part have addressed governmental efforts to benefit religion or particular religions[.]" *Id.* The Complaint here includes no allegations of this sort. It does not allege that Defendants attempted to benefit religion generally or endorse particular religions at the expense of Mr. Haidari's Muslim faith. The claim could be dismissed on just this basis.

It is true that some cases condone analyzing claims alleging official disapproval of a particular religion under the Establishment Clause. *See Am. Fam. Ass'n, Inc. v. City and Cnty. of San Fransisco*, 277 F.3d 1114, 1120–21 (9th Cir. 2002) (holding that the Establishment Clause "applies not only to official condonement of a particular religion or religious belief, but also to official disapproval or hostility towards religion"); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1396 (9th Cir. 1994) ("The government neutrality required under the Establishment Clause is thus violated as much by government disapproval of religion as it is by government approval of religion.").

That is how Defendants approach the issue in their motion. *See* Defs.' Mem. in Supp. at 13–16. They argue that Mr. Haidari has failed to plausibly allege an Establishment Clause claim because historical practices support the Government's border-control authority and because maintaining border security is a compelling government interest. *Id*. Defendants point specifically to the "'long-standing right of the sovereign to protect itself

10

by stopping and examining persons and property crossing into the country.'" *Id.* at 15 (quoting *United States v. Ramsey*, 431 U.S. 606, 616–19 (1977)).

These issues were addressed in a recent case from the Central District of California. In *Kariye v. Mayorkas*, No. cv 22-01916-FWS-GJS, 2022 U.S. Dist. LEXIS 186915 (C.D. Cal. Oct. 12, 2022), the plaintiffs challenged the questioning of Muslim travelers about their religion at border crossings and international airports. The *Kariye* court was faced with specific, detailed factual allegations of CBP officers detaining and then questioning the plaintiffs about their religious beliefs, practices, and associations during travel. *Id*. at **4–43. The *Kariye* court carefully addressed the "substantial legal authority supporting the government's historically broad authority to implement security measures at the border," *id*. at **57–58, as well as the "substantial authority holding that maintaining border security is a compelling government interest," *id*. at *59. Despite the plaintiffs' extensive factual allegations, the *Kariye* court found that "reference to historical practices and understandings" weighed against finding an Establishment Clause violation based on religious questioning at the border "[i]n light of the case law holding that the government has plenary authority at the border and that maintaining border security is a compelling government interest." *Id*. at **59–60. Thus, plaintiffs "ha[d] not sufficiently alleged an Establishment Clause violation." *Id*. at *60.

Again, unlike in *Kariye*, Mr. Haidari here asserts only conclusory allegations connecting his SSSS designations and enhanced screening to his Muslim faith. He does not describe what happened during his enhanced screenings that might connect the screenings to his Muslim faith. He does not allege that he was ever asked about his faith.

11

In other words, as pleaded, this case is a far cry from *Kariye*, and *Kariye*'s persuasive rationale shows why even certain added allegations would not plausibly show an Establishment Clause violation.

C

Mr. Haidari's Free Exercise and RFRA claims may be analyzed together. The Free Exercise Clause "prohibits government from enacting laws, promulgating regulations, or adopting policies that 'compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma.'" *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1052–53 (8th Cir. 2020) (quoting *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)). "The Free Exercise Clause requires only that the statutes at issue be neutral and generally applicable; incidental burdens on religion are usually not enough to make out a free exercise claim." *New Doe Child #1*, 901 F.3d at 1025. To plead a Free Exercise claim, a plaintiff "must establish that the governmental activity at issue places a substantial burden on [his] religious practice." *Northland Baptist Church of St. Paul v. Walz*, 530 F. Supp. 3d 790, 811 (D. Minn. 2021), *aff'd sub nom. Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365 (8th Cir. 2022), *cert. denied sub nom. Glow In One Mini Golf, L.L.C. v. Walz*, 143 S. Ct. 574 (2023); *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). "One's free-exercise right is substantially burdened when a regulation 'significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a person's individual religious beliefs; ... meaningfully curtail[s] a person's ability to express

12

adherence to his or her faith; or den[ies] a person reasonable opportunity to engage in those activities that are fundamental to a person's religion.'" *Northland Baptist Church*, 530 F. Supp. 3d at 811 (quoting *United States v. Ali*, 682 F.3d 705, 709–10 (8th Cir. 2012)).

RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless it "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). A plaintiff makes a prima facie claim under RFRA by establishing: "(1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion." *Loop v. U.S.*, No. 05-cv-575 (JRT/FLN), 2006 WL 1851140, at *2 (D. Minn. June 30, 2006) (citing *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001)). "A substantial burden exists when the Government forces a person to act, or refrain from acting, in violation of his or her religious beliefs, by threatening sanctions, punishment, or denial of an important benefit as a consequence for noncompliance." *New Doe Child #1*, 901 F.3d at 1026; *Loomer v. Tlaib*, No. 19-cv-2322 (DSD/TNL), 2019 WL 6840184, at *3 (D. Minn. Dec. 16, 2019).

Here, Mr. Haidari alleges no facts that might support an inference that his travel delays and questioning have imposed any burden on his religious exercise. Though the Complaint plausibly alleges that Mr. Haidari has suffered travel delays, and that he has been forced to endure lengthy inspections and to change his travel plans, he does not allege anywhere that these travel burdens kept him from exercising even one aspect of his Muslim faith. He does not allege, for example, that he was prevented from engaging in prayer,

worship, or any other religious practice.  Nor does Mr. Haidari allege that some aspect of the enhanced screening compelled him to act in a way that was inconsistent with his faith. Mr. Haidari's Free Exercise and RFRA claims must be dismissed.

D

"The Equal Protection Clause of the Fourteenth Amendment provides that no state shall deny to any person within its jurisdiction the equal protection of the laws, and it applies to the federal government through the Due Process Clause of the Fifth Amendment." *New Doe Child #1 v. United States*, 901 F.3d 1015, 1027 (8th Cir. 2018) (citations and internal quotation marks omitted).  "The Equal Protection Clause demands that similarly situated individuals be treated alike." *Id.* (citation omitted).

Mr. Haidari's Equal Protection allegations are conclusory.  He alleges that "Defendants have discriminated based on his Muslim faith by unswervingly assigning him SSSS classification every time he travels, resulting in lengthy delays, intrusive[] and humiliating interrogations, searches, and seizures of property."  Compl. ¶ 71.  He alleges that Defendants' conduct "is substantially motivated by discrimination against Muslims and has a disparate effect on them relative to members of other religions because Defendants do not routinely subject travelers of other religions to similar treatment."  *Id*. ¶ 74.  Mr. Haidari has simply alleged no facts that would support a plausible inference of discriminatory purpose or disparate treatment.

14

E

Mr. Haidari alleges that the DHS and CBP Defendants "appear to have retaliated against [him] for filing federal court action against them for failing to adjudicate his application for permanent residency within a reasonable time due to his Muslim faith." Comp. ¶¶ 60–67. It appears that this claim relates to a 2006 complaint for a writ of mandamus that Mr. Haidari filed in this Court after the United States Citizenship and Immigration Services ("USCIS") failed to timely adjudicate his application for permanent residency. *See Haidari v. Frazier*, No. 06-cv-3215 (DWF/AJB), 2007 WL 5118370, at *1 (D. Minn. May 10, 2007). Mr. Haidari alleges that DHS and CBP have inflicted the alleged travel delays, interrogations, searches, and seizures in retaliation against him for filing that 2006 lawsuit. *See* Compl. ¶ 66.

The First Amendment generally prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman*, 547 U.S. at 256). The retaliatory motive "must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (quoting *Hartman*, 547 U.S. at 260).

Here, Mr. Haidari speculates. He alleges only that Defendants "appear to have" retaliated against him for filing the 2006 action. Compl. ¶ 65. He offers no factual allegations plausibly showing that this unrelated, seventeen-year-old lawsuit against

15

USCIS caused DHS and CBP's alleged actions here.  In the absence of any facts to support his conclusory assertions of retaliation, Haidari's First Amendment retaliation claim must be dismissed.

*

There is a question whether the dismissal of Mr. Haidari's Complaint should be with or without prejudice.  After Defendants filed their motion to dismiss, Mr. Haidari could have, but did not, amend his Complaint.  *See* Fed. R. Civ. P. 15(a).  Mr. Haidari defended against Defendants' motion by relying on the current version of his Complaint.

Courts ultimately have discretion to decide between a with-prejudice and without-prejudice dismissal.  *See Paisley Park Enters. v. Boxill*, 361 F. Supp. 3d 869, 880 n.7 (D. Minn. 2019).  A dismissal with prejudice is typically appropriate when a plaintiff has shown "persistent pleading failures" despite one or more opportunities to amend, *Milliman v. Cnty. of Stearns*, No. 13-cv-136 (DWF/LIB) 2013 WL 5426049, at *16 (D. Minn. Sept. 26, 2023); *see Reinholdson v. Minnesota*, No. 01-cv-1650 (RHK/JMM), 2002 WL 32658480, at *5 (D. Minn. Nov. 21, 2002) (adopting report and recommendation), or when the record makes clear that any amendment would be futile, *see Paisley Park*, 361 F. Supp. 3d at 880 n.7.  On the other hand, when a plaintiff's claims "might conceivably be repleaded with success," particularly where discovery directed toward other, non-dismissed defendants might reveal yet-unknown evidence implicating a dismissed defendant, dismissal without prejudice may be justified.  *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *report and recommendation adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019).

The better answer here is to dismiss Mr. Haidari's Complaint without prejudice. The case is at a somewhat unusual posture because Mr. Haidari's original counsel has been suspended from the practice of law in the courts of Minnesota and in this Court,[5] and Mr. Haidari was given additional time to retain substitute counsel before the scheduled hearing and prior to a decision on Defendants' motion being issued.  It seems reasonable to give Mr. Haidari's new counsel an opportunity to address the original Complaint's deficiencies. Mr. Haidari's original counsel requested that opportunity in his opposition brief.  *See* Pl.'s Mem. in Opp'n at 19–20.  Counsel accompanied his request with a general description of allegations that might be added as part of an amendment, and these allegations are directed at curing some of the original Complaint's shortcomings.  Mr. Haidari will be ordered to file any amended complaint within thirty days of the date of this order, or on or before September 25, 2023.  If no amended complaint is filed by that deadline, the original Complaint will be dismissed with prejudice and on the merits.

---

[5]     Mr. Haidari was represented originally by attorney Herbert A. Igbanugo.  On April 26, 2023, the Minnesota Supreme Court suspended Mr. Igbanugo from the practice of law for ten months, effective May 10, 2023.  *In re Disciplinary Action Against Igbanugo*, 989 N.W.2d 310, 332 (Minn. 2023).  Mr. Igbanugo's suspension before the courts of the State of Minnesota triggered his automatic suspension from the practice of law before this Court during that same period.  *In the Matter of the Petition for Disciplinary Action against Herbert Azubuike Igbanugo*, No. 23-mc-45 (PJS).

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED THAT:**

1.      Defendants' Motion to Dismiss [ECF No. 15] is **GRANTED**; and

2.      Plaintiff's Complaint is **DISMISSED WITHOUT PREJUDICE**.

3      Within 30 days of the date of this Order, or on or before September 25, 2023,

Plaintiff may file an amended complaint.  If no amended complaint is filed by that deadline,

judgment will be entered dismissing the original Complaint with prejudice and on the

merits.

Dated:  August 24, 2023                               s/ Eric C. Tostrud
                                                      Eric C. Tostrud
                                                      United States District Court

18